## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| MICAH STONE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:13CV2578 RLW |
| | ) |
| McGRAW-HILL GLOBAL EDUCATION | ) |
| HOLDINGS, LLC, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No.

32). The motion is fully briefed and ready for disposition. Upon review of the motion and

related documents, the Court finds that summary judgment in favor of the Defendant is

appropriate.

### I. Background

In February 2007, Defendant McGraw-Hill Global Education Holdings, LLC ("McGraw-

Hill") hired Plaintiff Micah Stone as a Sales Representative in Miami, Florida. (First Amended

Complaint ("FAC") ¶ 8, ECF No. 15; Stone Dep. 16:15-21, ECF No. 33-4) His duties included

calling on instructors in Florida schools, visiting their departments, finding out their needs, and

ultimately selling college textbooks and educational products to the instructors and schools.

(Stone Dep. 18:20-24; Wildes Aff. ¶ 3, ECF No. 33-6) Plaintiff's salary in 2011 was $59,384.

(Williams Aff. ¶ 3, ECF No. 33-28) Also in 2011, Plaintiff applied for a position of Learning

Solutions Consultant ("LSC") in various locations, including St. Louis, Missouri. (Stone Dep.

30:3-15) Plaintiff interviewed with Irene McGuinness, Liz Wildes, Jim Kelly, Tom Malek, and

Brian Kibby. (Stone Dep. 30:16-31:8) He had several in-person and phone interviews

throughout the process, and eventually McGuinnes and Wildes recommended Plaintiff for promotion to the LSC position in St. Louis. (Stone Dep. 30:16-31:17; 35:25-36:22; Wildes Aff. ¶ 12) Both McGuinness and Wildes were aware that Plaintiff's race was African-American. (Wildes Aff. ¶ 13)

During the in-person interview with McGuinness and Wildes, they discussed Plaintiff's salary. (Stone Dep. 33:5-35:11) Plaintiff believed that they had agreed, and shook, on a starting salary of $95,000. (Stone Dep. 33:7-10) After the interview, Plaintiff sent an email to McGuinness incorporating this salary and accepting the job offer. (Stone Dep. 35:4-5; Stone Aff. Ex. 2, ECF No. 40-4) However, McGuinness told Plaintiff not to get ahead of himself because he still had two more interviews. (Stone Dep. 35:8-11; Stone Aff. Ex. 2) Kibby ultimately determined that $85,000 was an appropriate starting salary, and Wildes extended an oral offer of employment to Plaintiff, which he accepted. (Wildes Aff. ¶¶ 16, 17; Stone Dep. 36:20-25; 38:1-7; Williams Aff. Ex. A, ECF No. 33-29) White employees in LSC positions in the Central Region had starting salaries either less than or equal to Plaintiff's base salary of $85,000. (Stone Dep. 40:20-41:10; Wildes Aff. ¶¶ 22-23, Ex. B-D) The other two LSC employees in the region, Brad Ritter and Bob Scanlon, received higher salaries but had prior experience in positions similar to the LSC position at a competing company. (Wildes Aff. ¶¶ 26-28) Plaintiff protested the salary and also complained to human resources. (Stone Dep. 37:1-23, ECF No. 40-1; Pl.'s Ex. 5, ECF No. 40-16)

Plaintiff began working as an LSC in the fall of 2011, when he transitioned from Sales Representative in Miami to LSC in St. Louis. (Stone Dep. 51:15-55:8, ECF No. 33-4) Plaintiff was paid the higher salary during this transition period. (Stone Dep. 51:15-22) His direct

supervisor was Wildes, and McGuinness was Plaintiff's second level supervisor. (Stone Dep. 57:22-58:2; Wildes Aff. ¶ 19)

The LSC position was a leadership position, requiring Plaintiff to work with Sales Representatives in his territory; their District Manager Kim Nentwig; and his direct supervisor, Learning Solutions Manager for the Central Region Liz Wildes. (Williams Aff. Ex. B, ECF No. 33-30; Wildes Aff. ¶¶ 4-7) The position also required Plaintiff to lead, coach, develop, motivate, and manage his assigned team sales. (Williams Aff. Ex. B) Plaintiff did not feel part of Wildes' team because she had not worked with Plaintiff in his territory, unlike other LSCs in the Central Region. (Stone Dep. 120:10-14; 121:19-23; Stone Aff. ¶ 11, ECF No. 40-2)

On January 7, 2012, while attending a national sales meeting in Phoenix, Arizona, Wildes and McGuinness met with Plaintiff and mentioned that he had been late to meetings. (Stone Dep. 187:20-190:20; Wildes Aff. ¶¶ 33-34) Prior to the meeting, Wildes had received complaints from Sales Representatives about Plaintiff. (Wildes Aff. ¶ 30, Ex. H, ECF No. 33-14) On January 15, 2012, Wildes sent an email to Plaintiff recapping the January 7 meeting and listing four job expectations, including the need to be on time for meetings and the expectation that he work all day on campus with his reps and have a 24 hour turnaround time on email and phone calls to reps. (Wildes Aff. Ex. I, ECF No. 33-15) Plaintiff contends that he had good reason for being late to two meetings, namely he was stuck in traffic due to a snow storm and a rep's failure to send a text in advance of picking him up. (Stone Dep. 181:4-14; 190:14-192:5) However, he testified that he was he was not otherwise late to meetings. (Stone Dep. 192:6-8; Brauchie Aff. ¶ 7, ECF No. 40-38)

Around January 31, 2012, Plaintiff, Wildes, and Bridgette Hannenberg attended a conference in Pittsburgh, Pennsylvania. (FAC ¶ 15B) Plaintiff alleges that he overheard Wildes

3

tell Hannenberg that she wished she never hired "his black ass." (FAC ¶ 15B; Stone Dep. 99:15-25) Wildes denies making said statement. (Wildes Aff. ¶ 37)

On March 8, 2012, Plaintiff received a written warning stating that Plaintiff was not meeting expectations and that his performance was inadequate. (FAC ¶ 17; Stone Dep. 235:13-25, 245:11-14; Wildes Aff. Ex. K, ECF No. 33-17) In particular, the warning identified four areas of concern: (1) "problematic communications and working relationships with key collaborators"; (2) "punctuality and attendance issues"; (3) "follow-up and response time delays"; and (4) "organization of work issues." (Wildes Aff. Ex. K)

The written warning referenced a meeting on January 12, 2012, where Plaintiff left a breakfast sales-strategy meeting after Nentwig allegedly grabbed his arm by force. (Wildes Aff. Ex. K; Stone Dep. 185:2-24) Plaintiff attributed this to her aggression. (Stone Dep. 185:21-24) While not specifically asked whether the action was motivated by race, Plaintiff never testified that the act was racially motivated. (Stone Dep. 180:17-187:19) Nentwig sent an email apology the following day. (Pl.'s Ex. 9, ECF No. 40-20) However, Plaintiff alleges that this, along with other actions created a hostile work environment based on race. (FAC ¶ 15)

The written warning of March 8, 2012 further noted that since the January 12, 2012 meeting, there had been a breakdown in communication between Plaintiff, Nentwig, and others in his district. (Wildes Aff. Ex. K) Specifically, the warning noted that co-workers indicated that they found it difficult to communicate with Plaintiff because he responded in a hostile or condescending tone, and, therefore, almost no direct communication existed between Plaintiff and his colleagues. (*Id.*) The warning included guidance and instructions for Plaintiff to follow for performance improvement. (*Id.*) Further, the warning advised that a failure to improve could

4

result in disciplinary action, including termination without further warning. (*Id.*) Plaintiff acknowledged he read the warning by signing the document. (*Id.*; Stone Dep. 236:3-11)

Between March 8, 2012 and the date Plaintiff was terminated, Wildes communicated with Plaintiff on multiple occasions regarding his deficient performance, including missing a weekly team conference call and failing to communicate with Nentwig in person and over the phone. (Wildes Aff. ¶ 43, Exs. L-Q, ECF Nos. 33-19 to 33-24) Further, following the written warning, Wildes continued to receive complaints about Plaintiff from the Sales Representatives. (Wildes Aff. Ex. R, ECF No. 33-25) Plaintiff disputed that his performance was deficient and claimed that his work requirements were more stringent than other LSCs. (Pl.'s Exs. 20-22, ECF Nos. 40-31 to 40-33) On April 19, 2012, Wildes submitted a memo to Keith Eng, Human Resources Manager, detailing specific instances where Plaintiff failed to meet expectations, and she recommended that Plaintiff's employment be terminated. (Wildes Aff. Ex. S, ECF No. 33-26) Defendant discharged Plaintiff on April 26, 2012 for poor performance. (FAC ¶ 18; Stone Dep. 243:23-25, 245:11-19; Wildes Aff. ¶ 50) Plaintiff alleges that the facts do not support Defendant's finding that Plaintiff's performance was deficient and instead, his termination was motivated by race.

On April 9, 2014, Plaintiff filed a First Amended Complaint against Defendant McGraw-Hill alleging discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, as amended, 42 U.S.C. § 1981, and the Missouri Human Rights Act, Mo. Rev. Stat. §§ 213.010, *et seq.* Plaintiff alleges that he was unfairly compensated due to his race; subjected to a hostile work environment; wrongfully discharged due to his race; and retaliated against him for

complaining about the discriminatory treatment.[1] Defendant filed its Motion for Summary

Judgment on November 25, 2014, arguing that Plaintiff's compensation was appropriate and

comparable to non-minority LSCs. Defendant further contends that Plaintiff's two allegations of

harassment do not satisfy the standard of a hostile work environment, nor has Plaintiff presented

sufficient evidence to support his claim that his discharge was based on race. Finally, Defendant

asserts that Plaintiff was discharged for documented performance problems and not for any

retaliatory reason.

## II. Legal Standards

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for

summary judgment only if all of the information before the court show "there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must view

the evidence and all reasonable inferences in the light most favorable to the non-moving party.

*Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 775 (8th Cir. 1995).

The moving party has the initial burden to establish the non-existence of any genuine

issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v.*

---

[1] In his response in opposition to the summary judgment motion, Plaintiff fails to address
Defendant's arguments with regard to the retaliation claim. Thus, the Court deems the retaliation
claim abandoned and will grant summary judgment in Defendant's favor on that claim. *See
Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Tr.*, 558 F.3d 731, 735 (8th Cir. 2009) (holding
that plaintiff waived her retaliation claim because she did not contest defendant's motion for
summary judgment on the claim); *Allen v. Missouri*, No. 4:11-CV-2224-JAR, 2013 WL
2156259, at *12 (E.D. Mo. May 17, 2013) (construing plaintiff's failure to respond to certain
claims addressed in defendants summary as an abandonment of those claims); *Willis v.
Cleveland*, No. , 2009 WL 73728, at *1 (E.D. Mo. Jan. 7, 2009) (finding that plaintiff abandoned
her claims based on gender because she failed to address those claims in her opposition to
defendant's motion for summary judgment).

*Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is

discharged, if the record does in fact bear out that no genuine dispute exists, the burden then

shifts to the non-moving party, who must set forth affirmative evidence and specific facts

showing there is a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 249 (1986).

When the burden shifts, the non-moving party may not rest on the allegations in its pleadings,

but by affidavit and other evidence must set forth specific facts showing that a genuine issue of

material fact exists. Fed. R. Civ .P. 56(e). The non-moving party "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). In fact, the non- moving party must present

sufficient evidence favoring the non-moving party which would enable a jury to return a verdict

for that party. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. Self-serving, conclusory

statements, standing alone, are insufficient to defeat a well- supported motion for summary

judgment. *O'Bryan v. KTIV Television,* 64 F.3d 1188, 1191 (8th Cir. 1995). "There is no

'discrimination case exception' to the application of summary judgment, which is a useful

pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (citation omitted).

## III. Discussion

### A. Compensation

Plaintiff claims that, as a LSC, Defendant paid him substantially less than white

individuals even though Plaintiff was equally or better qualified for the LSC position. He

contends that his base salary was less than similarly situated white people, and he was not fully

7

compensated for working two jobs during his transition from Sales Representative to LSC.
Defendant argues that this claim fails as a matter of law.

Under Title VII, it is unlawful for an employer to discriminate against an individual with
respect to compensation on the basis of race, color, religion, sex, or national origin. *Onyiah v. St.
Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012) (citing 42 U.S.C. § 2000e-2(a)(1)). Absent
direct evidence of discrimination, courts analyze a Title VII salary-discrimination claim under
the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03
(1973).[2] *Id.* A plaintiff must first demonstrate a prima facie case of discrimination by showing
"(1) he is a member of a protected class; (2) he was meeting [his employer's] legitimate job
expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees
outside the protected class were treated differently." *Id.* (citation omitted). If a plaintiff
establishes a prima facie case, the burden shifts to the defendant to "'articulate a legitimate,
nondiscriminatory reason'" for the pay disparity. *Id.* (quoting *Fields v. Shelter Mut. Ins. Co.*,
520 F.3d 859, 864 (8th Cir. 2008)). The burden then shifts back to the plaintiff to prove that
defendant's proffered reason is a pretext for discrimination. *Id.* However, at all times the
plaintiff retains the burden of proof that his employer discriminated against him. *Id.*

Here, Plaintiff is unable to establish a prima facie case of salary discrimination based on
his race. Plaintiff must demonstrate that Defendant "paid different wages to employees of
different races for 'equal work on jobs the performance of which requires equal skill, effort, and
responsibility, and which are performed under similar working conditions.'" *Tademe v. Saint*

---

[2] Plaintiff also raises his federal discrimination claims under 42 U.S.C. § 1981. Where a
plaintiff relies on circumstantial evidence of discrimination, courts assess both the Title VII and
§ 1981 discrimination claims under the burden-shifting framework of *McDonnell Douglas*.
*Johnson v. AT & T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005). Therefore, the Court's analysis of
Plaintiff's federal causes of action will combine the Title VII and § 1981 claims for wage
discrimination, hostile work environment, and discriminatory discharge.

*Cloud State Univ.*, 328 F.3d 982, 989 (8th Cir. 2003) (quoting *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 684 (8th Cir. 2001)). The facts show that Plaintiff received a 43% raise when promoted to his new position. In addition, his salary of $85,000 was more than or equal to three of the other five LSCs in the Central Region, all of whom were white. Plaintiff does not refute these facts. The Court therefore finds that Plaintiff has failed to produce evidence to satisfy the requirements of a prima facie case of race-based wage discrimination. *Sowell,* 251 F.3d at 684 (granting summary judgment in favor of defendants where evidence established that plaintiff female employee was paid the same as, or more than, at least some of her male coworkers).

With regard to the other two white LSCs that were paid higher salaries than Plaintiff, assuming Plaintiff has made a prima facie case, he "has the burden to prove that he and these higher paid [LSCs] are 'similarly situated in all relevant respects' – a 'rigorous' standard at the pretext stage." *Onyiah*, 684 F.3d at 717 (quoting *Torgerson v. City of Rochester*, 843 F.3d 1031, 1051 (8th Cir. 2011) (internal quotation and citation omitted)). Plaintiff has failed to demonstrate that he and the two white LSCs are similarly situated in all respects. Mr. Ritter and Mr. Scanlon were hired from competitors of McGraw-Hill and had prior experience in roles similar to the LSC position. Plaintiff, on the other hand, had no prior experience as an LSC or similar job, and his past role was as a Sales Representative, which differs from that of an LSC. As such, Plaintiff has failed to satisfy the prima facie Title VII case of race-based wage discrimination with regard to the two white LSCs hired externally. *See Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (finding employees hired externally and directly from a competitor were not similarly situated to the plaintiff, who was promoted through the ranks of

9

defendant company). Therefore, Defendant is entitled to judgment as a matter of law on Plaintiff's claim of wage discrimination based on race.[3] *Id.* at 865.

## B. Hostile Work Environment

Plaintiff next claims that he was subjected to a hostile work environment based on incidents he experienced while employed as an LSC. Plaintiff claims that his co-worker Nentwig forcibly grabbed his arm during a breakfast meeting and that he overheard his supervisor Wildes tell a colleague that she wished she never hired Plaintiff's "black ass." He also claims that Wildes asked one of Plaintiff's Sales Representatives whether Plaintiff acted inappropriately. Further, he generally alleges that Nentwig interfered with his relationships with Sales Representatives and that Plaintiff was required to work under harsher conditions than the other LSCs. To establish a claim for hostile work environment, Plaintiff must show: "(1) he or she belongs to a protected group; (2) he or she was the subject of unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer know or should have known of the harassment and failed to take proper action." *Tademe,* 328 F.3d at 991 (citation omitted).

Defendant asserts that Plaintiff's allegations of harassment are not, individually or collectively, of sufficient severity or pervasiveness to constitute a hostile work environment. "Hostile work environment harassment occurs when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Singletary*

---

[3] Plaintiff also claims that he was discriminated against by not receiving a spot bonus for performing the jobs of both a Sales Representative and LSC during the transition period. Plaintiff has failed to present any evidence that similarly situated white employees received a spot bonus that Plaintiff was denied.

10

*v. Missouri Dep't of Corrs.*, 423 F.3d 886, 892 (8th Cir. 2005) (quoting *Tademe*, 328 F.3d at 991). The conduct must be severe as viewed objectively by a reasonable person and subjectively by the alleged victim. *Id.* To determine whether a work environment would be objectively offensive to a reasonable person, courts "examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Id.* at 892-93 (citation omitted).

By Plaintiff's own admission, he overheard only one remark related to his race, which Wildes denies she stated. "[R]acial slurs alone do not render a work environment hostile as a matter of law." *Id.* at 893. In *Singletary,* the court found that several racial slurs not directed to the plaintiff were insufficient to create a hostile work environment. *Id.* Indeed, "[t]o be actionable, such conduct must be shown to occur with such frequency that the very condition of employment are altered and can be viewed by a reasonable person as hostile." *Id.* Here, the alleged remark was not directed to Plaintiff and happened once. This single occurrence does not meet the standard of an actionable claim for a hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII.") (citation and quotation marks omitted).

Further, with regard to the physical altercation with Nentwig, Plaintiff attributed this action to Nentwig's aggressiveness. He did not testify that the altercation was motivated by race. Indeed, the topic of discussion was strategy in the district. Plaintiff's additional claims of hostile work environment also fail. While Plaintiff was dissatisfied with his work environment, work policies, and his co-workers, none of the facts establish a causal nexus between the alleged

11

harassment and his race. *See Tademe*, 328 F.3d at 991 (finding no hostile work environment
where evidence showed that harassment stemmed from inter-departmental politics and
personality conflicts and not from actions taken for discriminatory reasons). Thus, summary
judgment on Plaintiff's hostile work environment claim is warranted. *Hannoon v. Fawn Eng'g
Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003).

## C. Discriminatory Discharge

Plaintiff also claims that he was discharged because he is black. To establish a prima
facie case for racial discharge under Title VII and § 1981, Plaintiff must show: "(1) he belongs to
a protected class; (2) he was qualified for his position as an [LSC]; (3) he was discharged; and
(4) the discharge occurred in circumstances which give rise to an inference of unlawful
discrimination." *Johnson v. A T & T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005). Specifically,
Plaintiff contends that he was meeting legitimate job expectations but that Defendant applied
different expectations to him compared to similarly situated white employees.

Assuming that Plaintiff has stated a prima facie case of discriminatory discharge, the
Court finds that Defendant has articulated a legitimate, non-discriminatory reason for terminating
Plaintiff's employment. Wildes detailed, in writing, that Plaintiff was late to meetings, that some
of the Sales Representatives expressed response time delays and did not want to work with him,
that he had problematic working relationships with key collaborators, and that he was not
properly managing or completing work projects.

Plaintiff argues that Defendant had no legitimate reason for firing him. However, where
the employer presents a nondiscriminatory reason for its decision, in this case for poor
performance, Plaintiff must present evidence that the circumstances permitted an inference of
unlawful discrimination. *Id.* Here, Plaintiff goes to great lengths to explain why Defendant's

12

reasons were wrong and why he met job expectations. He does not, however, identify any evidence suggesting that the true reason he was fired was due to his race. Indeed, Plaintiff's facts amount to nothing more than a "problematic relationship" between Plaintiff and Nentwig, as well as Wildes' alleged exaggerations and misinterpretations of his working relationships with other Sales Representatives. (Pl.'s Response in Opp. 13-14, 15-19, ECF No. 39)

First, the Court notes that Wildes made the initial decision to hire Plaintiff and that "'[t]here is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time.'" *Arraleh v. County of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006) (quoting *Herr v. Airborne Freight Corp.*, 130 F.3d 359, 362 (8th Cir. 1997)). Further, the facts demonstrate that Plaintiff received a written warning based upon evidence of tardiness and some Sales Representatives complaining about Plaintiff, as well as many other documented issues. Plaintiff has failed to proffer any evidence that the reasons provided by Defendant for terminating Plaintiff's employment were a pretext for unlawful discrimination.

To the extent that Plaintiff complains that he was treated differently than other similarly situated LSCs, he fails to show that the employees were similar in all relevant respects, such as evidence that the comparator employees had similar disciplinary histories or similar performance deficiencies or written warnings. *Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013). Plaintiff contends that he was required to work all day on campus with the Sales Representatives and submit detailed reports, yet white LSCs had more flexibility and were subjected to less scrutiny. To succeed in showing pretext, however, the employee must provide some evidence that other employees were not subject to the same level of scrutiny for similar conduct. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 798 (8th Cir. 2011) (citation

13

omitted). While Plaintiff presents some testimony that other LSCs did not need to submit work trip reports, Defendant correctly notes that Plaintiff had been issued a written warning based on deficient performance, requiring him to be on campus 3 to 4 days a week and submit trip reports to help reach his goals. (Wildes Aff. Ex. K) None of the other LSCs to which Plaintiff compares himself were performing under a written warning, and subjecting Plaintiff to closer scrutiny does not, alone, allow a reasonable inference of discriminatory animus. *Barber*, 656 F.3d at 799 (citation omitted). Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's claim of discrimination based on race under Title VII and § 1981.

## D. MHRA

Plaintiff claims that Defendant discriminated against him on the basis of race in violation of the MHRA by "paying Plaintiff substantially less compensation than it paid white individuals who were hired as [LSCs] at or about the same time as Plaintiff . . . ; by subjecting plaintiff to a hostile work environment; placing Plaintiff on written warning; and by discharging Plaintiff . . . ." (FAC ¶ 29, ECF No. 15) The Court acknowledges the Eighth Circuit case law that instructs lower courts to dismiss the MHRA claims without prejudice to allow the courts of Missouri to decide rather than exercise supplemental jurisdiction. *See Murphy v. St. Louis Univ.*, 450 Fed. App'x 552, 553 (8th Cir. 2012) (finding district court should have dismissed the MHRA claims rather than address them on the merits because the court was uncertain how Missouri courts would view the claims); *EEOC v. Con-Way Freight, Inc.*, 622 F.3d 933, 938 (8th Cir. 2010) (noting that the MHRA safeguards were not identical to federal standards and could offer greater discrimination protection, thus finding the better course was to allow the state courts to decide the merit of plaintiff's MHRA claims). In those and other similar cases, the court's jurisdiction was based on supplemental jurisdiction and not diversity of citizenship. *Trickey v. Kaman Indus.*

14

*Techs. Corp.*, No. 1:09-cv-00026-SNLJ, 2011 WL 2118578, at \*6 (E.D. Mo. May 26, 2011).

Here, however, Plaintiff's First Amended Complaint indicates that Plaintiff is a citizen of

Missouri, and Defendant is a corporation organized and existing under the laws of the State of

New York. (FAC ¶¶ 5-6) In addition, while Plaintiff does not specify an amount in his prayer

for relief, he does request back pay and other monetary damages that would likely exceed

\$75,000. 28 U.S.C. § 1332(a)(1) ("The district courts shall have original jurisdiction of all civil

actions where the matter in controversy exceeds the sum or value of \$75,000, exclusive of

interest and costs, and is between citizens of different States.). Therefore, the Court finds that

diversity jurisdiction exists and will address Plaintiff's remaining MHRA claims. *See Clark v.*

*Matthews Int'l Corp.*, 639 F.3d 391, 397 (8th Cir. 2011) (finding plaintiff's claims for back pay

exceeded the jurisdictional amount and addressing plaintiff's MHRA claim based on diversity of

citizenship).

"The MHRA prohibits employers from discriminating against any individual with respect

to [his] compensation, terms, conditions, or privileges of employment because of [his] race or

national origin." *Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 759 (8th Cir. 2015) (citing Mo.

Rev. Stat. § 213.055(1)(a)). The MHRA safeguards are not identical to federal standards and can

offer greater protection. *Id.* (citation omitted). "Unlike Title VII of the Civil Rights Act of 1964,

a MHRA discrimination claimant can avoid summary judgment by showing that [his] race or

national origin was a contributing factor rather than a substantial factor in the employer's

decision." *Id.* (citing *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 665 (Mo. 2009)). "A

'contributing' factor has been defined as one 'that contributed a share in anything or has a part in

producing the effect.'" *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 867 (Mo. Ct.

App. 2009) (quoting *McBryde v. Ritenour Sch. Dist.*, 207 S.W.3d 162,170 (Mo. Ct. App. 2006)).

15

In assessing Plaintiff's claims under the MHRA, courts are "guided by both Missouri law and federal employment discrimination case law that is consistent with Missouri law." *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. 2007).

To show a violation of the MHRA with regard to salary differential, Plaintiff must prove that his race was a contributing factor to the lower salary. *See, e.g., Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1074 (8th Cir. 2009). Plaintiff has failed to make such showing. As stated above, Plaintiff's salary was a higher than two of his white co-workers and equal to another. As such, no genuine issue of material fact exists with regard to a claim of wage discrimination under the MHRA.

To prevail on a hostile work environment claim under the MHRA, Plaintiff must establish that (1) he was a member of a protected group; (2) he was subjected to unwelcome protected harassment; (3) his membership in the protected group was a contributing factor in the harassment; and (4) a term, condition, or privilege of his employment was affected by the harassment. *Hill v. City of St. Louis*, 371 S.W.3d 66, 70-71 (Mo. Ct. App. 2012) (citation omitted). While Plaintiff contends that Nentwig and Wildes' course of conduct toward Plaintiff was sufficiently harsh and harassing to create a hostile work environment, Plaintiff fails to present any evidence that his race was a contributing factor to the alleged harassment or that the alleged harassment was severe enough to affect a term or condition of employment. Other than one stray remark, none of the behaviors complained of indicate any racial animus toward Plaintiff. His "unsupported statements that he believes that he was being discriminated against are insufficient in light of the lack of any race-based comments or conduct." *Reyna v. Barnes & Noble Booksellers*, No. 08-00369-CV-W-DGK, 2009 WL 929135, at *7 (W.D. Mo. Apr. 3,

16

2009); (citing *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000)).

Further, he presents no evidence that the alleged harassment rose to the severe and pervasive level of "discriminatory intimidation, ridicule, and insult." *Id.*; *but see Fuchs v. Dep't of Revenue*, 447 S.W.3d 727, 733-34 (Mo. Ct. App. 2014) (finding sufficient evidence of intimidation where plaintiff stated that her employer made many comments related to her disability and took action against her including denying requests to see her doctor). Instead, Plaintiff's allegations "amount to nothing more than mere scrutiny," which is insufficient to give rise to a hostile work environment claim. *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 809 (8th Cir. 2008).

For a discrimination claim under the MHRA, Plaintiff must demonstrate that (1) he was discharged; (2) Plaintiff's race was a contributing factor in his discharge; and (3) Plaintiff suffered damage as a direct result of the discharge. *Shirrell v. Saint Francis Med. Ctr.*, 24 F. Supp. 3d 851, 864 (E.D. Mo. 2014) (citing *Daugherty*, 231 S.W.3d at 820. Here, Plaintiff has failed to demonstrate that race was a contributing factor to the termination of his employment. The evidence shows that Plaintiff was discharged for numerous, documented performance deficiencies. Plaintiff was given a written warning with guidelines for improvement, and he failed to achieve those improvement goals. While Plaintiff complains that the need for a written warning was unfounded, there is no evidence that Wildes, who initially hired Plaintiff, had any racial bias against Plaintiff that contributed to his discharge. Thus, Defendant is entitled to judgment as a matter of law on Plaintiff's MHRA claims. *Id.* at 864-65; *see also Reyna*, 2009 WL 929135, at *5 (finding no evidence of race discrimination where none of plaintiff's myriad

17

of complaints were related to the perceived discrimination and his allegations of race

discrimination were self-serving and speculative).

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (ECF No.

32) is **GRANTED.** A separate Judgment will accompany this Memorandum and Order.

Dated this 26th day of August, 2015.

Ronnie L. White

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

18